2460270, SWIFT v. Commissioner of Internal Revenue, Mr. Insightig. May it please the Court. This case concerns a simple and straightforward question. That is, what is insurance? For decades, the Supreme Court and this circuit— Yes? You said it, and then you dropped your voice. What was the question again? What is insurance? Oh, wow. For decades, the Supreme Court and this circuit have held that insurance exists when there is a binding arrangement of risk shifting and risk distribution. The tax court reversibly erred when straying beyond those two objective criteria. We have three main points. First, the tax court erred in failing to cite the primary Fifth Circuit precedent in this area provided by Ross v. Odom. Second, the tax court's views on risk distribution are unsupported by any actuarial standard and conflict with prior case law and IRS guidance. And third, the tax court erred when adding several multi-factor tests to the analysis, which in application limit the meaning of the relevant statute. The combined 14 factors effectively restrict the statute and deny access to benefits provided by Congress. Getting back to the first point— Let me just ask you a quick question. Has Chamberlain Hurdlick been in the business of helping set up these little mini-insurance companies? Yes, Your Honor. Microcaptives. Yeah. Just wondered. It's a big deal, right? Yeah. Sure. And what parts of the economy tend to have these microcaptive insurers? I'd say industries where they have trouble finding insurance in the commercial market. That's where we—that's where most of our clients— So you have a lot of doctors? Sure. Well, in this case, Dr. Swift started this back when there was the medical malpractice insurance crisis in Texas. He could not find adequate medical malpractice insurance at the time, and this was his solution. What period of time in the relevant years from 2012 to 2015 did Dr. Swift not have medical malpractice insurance? Well, no. So this started back in 2004. So in what period of time did he not have medical malpractice insurance? Before that. Before 2004? Correct. Yeah. Where in the record does it show that he didn't have medical malpractice insurance? I can't point to that right now. I believe it was his testimony, and there was some correspondence with Celia Clark where they discussed that prior to him forming the captive, he just had a reserve. He was self-insured. Correct. Yeah. And the difference between self-insurance and a micro-captive is what? So a micro-captive is, it's a separate entity, and under the Supreme Court's Mullian Properties case you're supposed to respect that. Here, the physicians, they would not have otherwise been able to sue or rely on that insurance reserve. There was no contract right for them to recover on any type of malpractice insurance. This was just something that Dr. Swift did really to protect himself. So in 2004, he was doing business with no medical malpractice insurance, self-insured? That's right. Yeah. And then in 2004, before he had a mainline third-party insurance carrier, he formed a micro-captive to provide not just tail insurance, but also claims-based insurance for med-mal claims. That's right. And how long did he have claims-based med-mal insurance just exclusively through the micro-captive? Through 2015. And when did he get third-party? When I'm saying mainline, I mean like what normal Texans would think of as like a, you know, a med-mal insurance. When did he get third-party mainline med-mal insurance? I believe that was in 2016. 2016. So after the end of the micro-captive? Right. So at no point was the med-mal insurance duplicative between the micro-captive and the mainline? No. So during the years at issue, when he purchased the commercial for current year claims, it specifically had a part where you had to acknowledge that you were covering your tail risk elsewhere. There was never, ever any overlapping coverage. I know he had micro-captive insurance for the tail claims, but you're telling me he had micro-captive insurance for the claims-based current year? No. Then I misunderstood your answer to my question. I'm sorry. He always had a commercial policy that covered current year claims that occurred in the current year, which is a very small portion of your risk. The majority of his coverage was under the tail risk, which was covered through the captive insurance. So I asked you earlier, how long did he operate with no med-mal insurance? And you said no mainline med-mal insurance at all until 2016. No, no. Okay. That's what you said to my question. So maybe we just misunderstood each other. So let me go back, because I need to understand it. When did he get mainline claims-based med-mal insurance? It would have been 2004 for the small current year risk, yeah. So getting back to the first point. The single most important issue presented by this case is that historically, the test for insurance in this circuit is objective and straightforward. Insurance exists where there is risk shifting and risk distribution. This was laid down by the Supreme Court in LaGearce and recognized by the Fifth Circuit in Ross V. Odom. The two-part test was further confirmed correct in two subsequent Fifth Circuit cases, Steer Tank Lines and FW Services. The two-part test makes sense because in practice, insurance is plain. It's a form of contract. And the tax court and the IRS agree that the policies in this case are valid and binding contracts. That means that the liability expressed in those contracts was shifted from hundreds of independent contractor physicians to the independent entities. The only issue left under Fifth Circuit precedent was whether the policies distributed the risk reflected in the various valid and binding contracts. And risk distribution is simple. Imagine a group of friends, each putting a little money into a jar every month. If one of them has an accident, they can use the jar's money to cover their costs. Instead of one person bearing the full financial burden, the risk is spread across the whole group, making it more manageable for everyone. That's what insurance companies do. Collect premiums for many people and use the pooled money to help those who experience a covered loss. And actuaries have a formula for measuring risk distribution. And that formula has been used in numerous prior cases. Dr. Summer used that formula in this case and showed that the medical malpractice policies were sufficient on their own to distribute risk. They covered hundreds of physicians for millions of doctor-patient interactions. The IRS and the tax court disagree, but they fail to cite any actual science or applicable case law. The tax court and the IRS simply say that the number isn't enough. The tax court referenced the number of risk events in Rent-A-Center and Harper, but those cases concern Section 831A captives, not Section 831B captives. The difference is that in those cases, there's no limit to the level of premiums that could be written. Here, the insurance companies could receive no more than $1.2 million. The other flaw in the tax court's analysis was its failure to reconcile a state of moire. Remember, that was a case where a pool of 200 brokers working in a single geographic location covered by one insurance policy was sufficient to distribute risk for insurance purposes. If 200 brokers was sufficient to distribute risk for life insurance, 199 physicians should be sufficient for malpractice. After recognizing that the valid and binding contracts in this case shift risk away from hundreds of physicians to separate entities where the malpractice risk is pooled and distributed, the inquiry should end. The contracts are for insurance, the doctors relied on those policies, and there were sufficient assets to cover claims. The doctors were subject to deductibles, they had a contract right to sue the insurance companies when there was a dispute about coverage. And if the medical malpractice policies are not enough to achieve risk distribution, then the reinsurance policies meet the standard. Did the doctors have other coverage? Not that I'm aware of. Really? Uh-huh.  So remember that Dr. Swift took a belt and suspenders approach. The only IRS guidance at the time said that taxpayers could qualify for the 831B election if the insurance companies entered into a contractual pooling arrangement with at least 12 other similarly situated companies where they agreed to reinsure each other's risks. Dr. Swift followed the IRS guidance and made sure that Castle Rock and Stonegate issued those same types of policies. The result is that the insurance companies received 40% of their premiums for malpractice, insuring the independent physicians, and 30% of their premiums were for reinsuring risks arising from 100 other insurance companies. What do you say about the tax court finding that there was a circular flow of funds? I mean, it's an irrelevant issue to whether or not there's insurance. Why? I'd cite Judge King's opinion, I think it was Corfield Glenn, that really went into an excellent analysis of the way Lloyd's of London works. Insurance is just a bunch of contractual commitments. It's whether or not someone is obligated to pay on a particular contract and whether or not they have enough pooled commitments to pay when liability arises. So between 2012 and 2015, how much did Dr. Swift pay to third-party med malinsurers? For the, I think it was between $30,000 and $60,000 per year. So let's call it $180,000, to give you the benefit of the doubt. In the same time period, how much did he pay for microcaptive insurance? I think it was about $300,000 to $400,000 per year. So let's call it $6 million? Oh, $6 million is everything. That's if you lump in the terrorism, the computer operations and data, the litigation expense, sure. So is it separately broken out for med malinsurance to the microcaptives? Correct. Yes. And so you think it was more like $1.5 million? I think so, yeah. So what basis, is there something in the record that you can point me to where an actuarial testified to say that the amount of risk that was insured by the microcaptives was ten to 15 times what was insured by the third-party med mal carrier?  Yeah. So we have the tail policies were priced by KPMG. I saw that, but I didn't understand. So I looked at it, and I saw the KPMG actuarial analysis. I saw it in your brief, but I don't understand how someone would compare those two things. The tail policies, as the name would imply, are supposed to be capturing residuals, not captured by the principal policy. But in this case, you have a principal premium amount that is one-fifteenth of the tail amount, which does seem to be suspicious, no? So in the KPMG reports, what they talk about is they assign premium amount to lag factors. Lag factors are how often after an event, how much time does it take for the claim to  And their conclusion, and it was supported by our own experts, is that most claims come into play between 24 months and 36 months from the doctor-patient interaction. So there's plenty of support in the record. And again, valuation, premium pricing, that's a separate issue as to whether or not something is insured. I mean, we said it's six million. The government says it's two million. That's a valuation dispute. Our primary When you're saying it's a valuation dispute, does that mean that the commissioner could reduce the amount of deductions that your client took instead of avoiding the whole micro-captive setup? That's right. And the IRS and the tax court do that all the time. In the insurance context, too. I mean, with 831A captives, a lot of times the fight is the deduction for estimated losses. That's a question of actuarial work. And so that deduction is often, the IRS imposes a haircut. So that's the issue here. You know, we're asking, is this insurance? We think it is. If there's a valuation issue, we need to address that separately. But I assume Dr. Swift never filed, in the relevant period from 2004 to 2015, never filed a MedMal claim of any kind. He didn't, but there were other physicians who did. And were any of them filed against the TAIL policy or only against the claims policy? Only one was against the commercial policy. The rest were against the TAIL policy. So what was the total amount of claims paid by the TAIL policy? Oh, I don't recall. It was over a million.  Yeah. But you don't have a record site? No. Not with me. So unless the Court has any questions about existing Fifth Circuit precedent, I'll move on to the multi-factor tests. So the error there was twofold. First in applying the multi-factor tests at all, and then second in applying them defectively and incompletely. The first problem in resorting to the multi-factor tests is that they're non-directive. Assuming all the factors don't line up in favor of one party, there's no weight to be applied to any particular factor. That's particularly problematic for taxpayers like the Swifts, who even under the tax court's own analysis have a majority of the factors either neutral or weighing in their favor. How can taxpayers plan accordingly when they don't know how much weight to give to particular factors? And what if, like in this case, the tax court's going to apply only three of the nine factors? That's an impossible way to administer a rule and cannot offer any predictable guidance for taxpayers. Second, many of the factors, particularly in how they're employed, only draw comparisons to huge commercial insurance companies. And the problem is that the statute doesn't make any such qualification. Section 831B doesn't say that it applies only to high-frequency, low-severity policies, or that it applies only to car insurance or homeowner's insurance, but those are the types of comparisons the tax court makes. The tax court failed to recognize that the insurance industry is much broader than that. The effects of the tax court and the IRS create limits to congressional tax benefits. That leads us to the third problem with the multi-factor test, which is that some of the factors have nothing to do with whether something is insurance in the first place. The main culprit there is pricing. Whether or not a policy is over- or underpriced has nothing to do with whether the contract is for insurance in the first place. It's a valuation issue. And finally, because many of the factors are not objective and can be applied at the whim of particular judges, the tests cannot determine the outcome of a dispute. The tests invite the making of arbitrary decisions based on gut feelings, personal experience, and unprincipled rules of thumb. All one needs to do is review the tax court's opinion in this case, with all of its comparisons to commercial policies and the commercial industry, and then contrast that with the numerous cases we cite concerning litigation in the excess and surplus lines industry. With the aid of the multi-factor test, the tax court wrote that part of the industry out of the statute. If the court is nonetheless inclined to adopt the nine-factor and five-factor test, then we ask that the court reverse, even so because of the inadequate application of those tests. The court considered only a fraction and failed to reconcile the factors weighing in the Swiss favor. What do you- you don't mention the Tenth Circuit case. What do you say about the Tenth Circuit case? Yeah, reserve mechanical. That case is distinguishable. First of all, the court specifically noted that no taxpayer challenged the fact that the tax court applied these multi-factor tests, or that there was an inadequate application of all the factors. The case is also distinguishable because the pool in that case, in order for the pool to pay claims, they had a very high attachment point. It was unlikely any claim would ever be paid on the pool, where in this case we had millions in pool claims. The other thing is, none of the other micro-captive cases have what we have, which is the medical malpractice component. That was always Dr. Swift's primary focus. The only reason he entered into these reinsurance policies was because that was the only IRS guidance out there. It said in order to qualify for the 831B election, you need to have these reinsurance policies where at least 30% of your premiums are accounting for insuring a bunch of unrelated insurance. The other distinguishing factor is that in that case, the reinsurance pool, I think, was domiciled in a foreign country, wasn't regulated, wasn't audited. Here the reinsurance pool was domiciled in the United States, regulated by a state insurance commissioner, and audited by certified public accountants. Thank you. You have time for rebuttal. Thank you, Ms. Wong. Good morning, Your Honors. Cheryl Wong for the Commissioner, and may it please the Court. Before I begin, I'd like to provide a couple of citations in response to Judge Holtham's questions that I hope you might find helpful. The first is with regards to Dr. Swift's history on commercial insurance. The test court made a finding on page 76147 in the record. And also, what might be helpful is page 59798, and that's a short but fairly comprehensive lost history for the clinic. And on the left-hand side of the page, it lists the names of the commercial insurers, so you can have a sense of the history. And also, that loss report also has the size of the indemnities that were paid out, expenses that were paid out, also the lag in the reporting time. So, in this case, we have a sophisticated business person who went out looking for risks to insure. Well, we all go looking for the best tax deductions we can find. Of course.  But the prerequisite to that is that there has to be a business purpose, a real purpose, right? You don't wake up one day and say, oh, I'm going to, I think I might want to pay a high insurance premium and let me go out and buy a car. That's backwards, right? You think you want to buy a car, and then you go out shopping for the best rates, for the best coverage that you want. And here, we don't even have, as our actuaries, as the actuaries and experts in this case testified, that there was no real effort to find premiums that were commensurate to the risks that were being insured. That's really what boils—I mean, it boils—doesn't your position boil down to two things? Number one, they always deducted the maximum amount in premiums, and number two, according to your analysis, the premiums exceeded the possibility of loss. What else was there that suggests this was not insurance? Okay. So the tax court decided that this was not insurance because, first, it did not distribute risk and because it was not insurance in the commonly accepted sense, and then the taxpayers were subject to penalties. But, I mean, I think they make a good point in saying that these 199 doctors could file a claim, that they could sue to get reimbursed for a claim, and that claims were filed and handled, right? Yes, but that doesn't make that sufficient risk distribution because of the fact that, from the insurer's standpoint, it needs to have enough eggs and enough baskets, right? So these doctors were practicing for one employer within a 100-mile radius with very controlled processes, right? So from the insurer's standpoint, those are not independent exposures. And without independence in the risk exposures, while clinic was about your honest question about how they would share costs, that is irrelevant, actually, respectfully, to risk exposure, right? And without independence in risk exposures, then the debate over how many risk exposures are enough. Are you saying doctors who work in emergency clinics, even though the clinics say we're only there to handle minor matters, are not sufficiently exposed to the threat of being sued? No, because of their processes. Because of their—the uniformity, their— But you're not—your argument doesn't—you talk about risk shifting. You're not really disagreeing that the policies that Dr. Swift's company set up were risk shifting. I take it the whole bulk of the argument is on risk distribution, right? Yes, that is one major part of the argument with regards to whether this is insurance or not. As far as risk shifting, the tax court didn't make findings on that, and the taxpayers didn't bring it up on a pew, which was their burden, so we did not respond to something that they did not bring up. No, but—okay. Okay. Yes. So the tax court also found, as a matter of fact, that 199 physicians were not a sufficient number of risk exposures compared to what it had found before to be sufficient, and also based on what the experts said in this case. The appellants brought up a state of Moyer with 200 stockbrokers under a life insurance scheme as sufficient. That issue was not litigated in that case. The issue litigated in that case was about whether something that wasn't organized as a company could be insurance. So 200, 199, that's not a magic number. And the tax court also found, staying within the realm of risk distribution, that the reinsurance pools did not distribute risk because they did not perform the functions of an insurance company. And before I get into it, reinsurance is a type of insurance, right? It's where the primary insurer seeks protection. We know this. Right. Okay. Right. So there should be a due diligence process about—on the part of the primary insurer about how much risk do I need to cede? Am I getting a fair—am I getting charged a fair premium for the risk that I'm ceding? What kind of coverage do I need in terms of reinsurance? And is the reinsurance company or arrangement, are their finances stable so that when I'm in need of it, I can actually get the protection that I'm looking for? And then sometimes the reinsurers seek another layer of reinsurance. What are their finances like? And our expert talked about this on page 80448 that explains this in more detail. And also, is the reinsurer rated, known by a third party? In here, we don't have this, right? Every participant captive cedes around 30% regardless of their individual risks in terms of what they're insuring, in terms of their financial condition. And every captive gets the same coverage limits on the Parts A and B, right? The same deductibles, same coverage limits. And then the premiums, when they were paid to the reinsurance pools, they came right back, almost all of it, very quickly. And that meant these pools, Jade and Emerald, were very unlikely to cover all the claims that could come in, and that's a finding of fact made by the tech court. There was no assessment on the part of the reinsurance pools whether those premiums reflected—I'm sorry, on the part of the captives, the quota share, sorry, arrangement, whether their premium reflected the nature of that blended risk. And instead, if a captive needed an actual payout on a claim, it would have to depend on the kindness of the other captives, on the pool's trustee's ability to raise money from 100 other captives domiciled abroad, right? And in the trust agreements, we pointed out how contractually the trustee's ability to raise money was severely curtailed. And practically, raising funds would be difficult because of the foreign domicile of these participant captives, 100 of them. And also because Ms. Clark's children owned part of the Jade pool, and in later years, Ms. Clark was a trustee of the later Emerald pool. Practically speaking, is she going to sue her clients for money if they're not willing to pay? And I want to zoom in a little on the terrorism policies in the reinsurance context. The tax court found how Dr. Swift's business already had $33 to $45 million worth of terrorism coverage for no cost, and that coverage, that rider, was financially backed by the United States government. In the reply brief, the appellants mentioned how they would be subject to 140% clawback from the government. I want to clarify that if you actually read the TRIA Act, Section 103, the clawback would be from the primary reinsurer, not the policyholders. But to contrast that with the captives, instead of the reinsurer, the financial backer, being the government or some very known entity, this is Jade and Emerald and 100 other captives whose financial conditions we know nothing about. And then, why weren't the medical malpractice policies in the pool? Those were the claims that were realistically would generate policies for a business like Dr. Swift's. They had probably more serious risks, insured more serious risks, than the other non-medical policies. And then, an additional ground for affirmance was that the captives were not insured in the commonly accepted sense. And this prong is not new, either with Supreme Court jurisprudence or this court's jurisprudence. We cited in our brief, Ligures, it's theorized that Congress used the word insurance in the commonly accepted sense. And even when it derived the risk-shifting and risk-distribution elements, it began the sentence with, historically and commonly, insurance involves risk-shifting and risk-distributing. So even with those undisputed elements, the Supreme Court at that time looked to historical and common practice. And then, in the facts of that case, there was no dispute that there were two valid and binding contracts issued by a commercial and related insurance company. The Supreme Court still invalidated that arrangement as insurance because of the surrounding circumstances. From this court, Ross. This court said, insurance generally reflects the coalescence of four things, including business need. Steer tank lines. This court affirmed a Supreme Court's finding that it was not insurance because the arrangement lacked the ordinary indicia of a legitimate insurance arrangement in the usual case. FW services. Same idea. Well, what do you say about a series of revenue rulings cited by the taxpayer that approved micro-captive arrangements? Well, there are two types of guidances that the taxpayer brought up. The private letter rulings, there were, I think, six of them. They were distinguishable in the way that the primary insurers in that case, in those private letter rulings, used actuarial methods, they were well-capitalized, and they investigated claims before they paid them out. And why is that important in terms of a reinsurance arrangement? Those facts, taken all together, would tend to enhance the pools and the primary insurers' abilities to actually pay on the claims. There's no question to be, as I understand it, and you don't really contend that they would pay claims just on the basic insurance provided, you know, without the reinsurance. For the captives, the ability to pay claims. No, I'm not talking about the captives.  I'm talking about the base insurance. There were claims. There was money to pay the claims, correct? Well, there was a lot of litigation ensued that NIDA Party focused on in the briefing when the participant captives needed money to pay claims, and there was substantial litigation that ensued over that. They did pay claims, but the tax court found that the loss ratios of the reinsurance pool were very different from what— But that goes to the viability of the deductions. That doesn't go to whether it's insurance. Well, it has to be insurance— If the doctors had no other insurance coverage and they relied on these policies, doesn't that—I know doctors are notoriously inept at business, but they're not inept at getting insurance, and if they relied on these policies, there were claims, but claims were paid. But the— I don't understand how you can deny that this looks like insurance. Well, because it has to be from both sides, right? Your Honor was referring to from the perspective of the insured, but from the insurer's side, it has to not only pay the claims, but also make sure that it stays solvent, and that goes to risk distribution, as well as whether this was insurance in a commonly accepted sense. I mean, in the Tenth Circuit case, if I understand it or recall it correctly, there was not any likelihood that they were going to pay claims. That was one of the factors that they found. In terms of— Yes, but there were a few. There were a few claims, compared to, I believe, the tax court. Other cases that the tax court looked at. I mean, I understand the concern that they're taking the maximum deductions each year and earning no taxable income on the investment of premiums. I understand that. But that, to me, goes to the amount of a deficiency, not to underlining the underlying—sorry, saying that the entire setup is a scam. Well, this is not a valuation dispute, Your Honor, because there is no tax benefit, as the Supreme Court said in CIC services, if this was not really for insurance. And we focused, and the tax court also focused, on whether the amount of the premiums was reasonable as part of its overall analysis as— Well, let me go at it another way. Outline for me precisely what would be the components of a viable microcaptive. Are you basically saying that groups of medical practitioners cannot get together and do microcaptive insurance? No, of course not. Actually, two of the experts that we hired had long experience advising, forming microcaptives, some of them—well, captives—some of them offshore, Ms. Mulder and Mr. Bendure. So there is no inherent anti-captive bias on the part of the government. The problem we have is that, of the facts that we have here, the taxpayers seem to have put the cart before the horse. What cart did they—of course he wanted to save money, but of course he wanted insurance. And why does the IRS say you've got to go to Aetna or something like that instead of doing your own little deep side deal? There are ways to run it properly, and there is case law on that. And I ask you, please outline for me actual facts that would have made this bona fide. What if more reasonable premiums, more actuarially defensible premiums, correct investment choices that would have made claims paying—that would have created a more liquid fund? Basically, I'm reciting the tax court opinion here. That and proper risk distribution in terms of, let's say there's a small business and— well, actually, also to your point, he actually didn't want to save money, right? He paid premiums that were very, very high. He didn't question the inclusion of doctors beyond the statute of limitations, etc., etc. And that, and if he had done that, right, and then participated in a pool that was actually acting as reinsurance, or he could band together with doctors all over the country and correctly diversified that portfolio and then said, oh, let's stay under $1.2 million. I think that— You have to diversify the risk, so it couldn't be a pool with other doctors. You had to go into other kinds of risks. Well, divers— Well, the facts differ as to what would be sufficient. Well, I'm sorry, but I thought that was one of the points that they thought they were required to do because of the revenue rulings and so on. Well, okay, yeah, I didn't address revenue rulings, but the revenue rulings about the 12 LLCs, there was no indication in that revenue ruling of 2005-40 that the LLCs had risks. I see my time is out. I will finish my answer. It was just 12 LLCs, right? They could be very diverse, the risks, exposures that they had, like in Securitas, in Rent-a-Center, in RVI. They were just one business, but they just had many thousands, tens of thousands more exposures. That would be the difference between our case and here. So unless the Court would like to address the penalties, thank you, and I'll cast the Court to affirm. Thank you. Okay, Mr. Ansari. Just a few points. The first, on the question of whether or not the physicians got coverage elsewhere, in the record, and I think the government included a part of it in the record excerpts on their tab 7, but record 69231-69233, it's a memorandum that Dr. Swift issued to the physicians each year where he explained the two different policies, the current year policy that covered period risks, and they signed that document acknowledging their coverage, and the physicians, there's evidence in the record where they would send emails to Dr. Swift asking for details of their coverage. Counsel, I want to pick up with something that Judge Jones asked and also something I asked you at the top side. You told me 20 minutes ago that the tail policies from 2012 to 2015, that is the microcaptive tail policies, paid, quote, millions in men malclaims. Are you prepared to stand by what you told me? My recollection is that there was a $500,000 claim paid by Castlegate, a $400,000 claim paid by Castlegate, and then there was a Kachurik claim that was several, I think it was like $250,000. So can you walk me through the difference between what you're saying, because I think everyone agrees that the claims being paid by these microcaptives is really important, and your friend, Ms. Wong, showed me the tax court findings of fact, and in particular, page 76,158 of the record, this says that the clinics paid Swift captives a total of $6 million from 2012 to 2015. There were three claims paid by the microcaptives for approximately $340,000. Of the $340,000, one is a tail claim, and that tail claim is for $13,000. Now there's a huge delta between what the tax court is saying and what you're saying, and I'm very confused. That's right. We're going back and forth. So I'm discussing over the entire period that Dr. Swift had a captive insurance company. So I thought that these captives were formed in 2010. Isn't Stonegate, and I'm sorry for forgetting the other one, they were not formed in 2010? The first captive was formed in 2006, or 5 or 6, Castlegate, and it was in existence until 2009, and then Stonegate and Castle Rock went into existence in 2010. So on that lost run report, you'll see some claims that are paid by Castlegate. That was the pre-2010 captive insurance company, and then beginning in 2010, you'll see claims paid by Stonegate and Castle Rock. But I've asked you three times this morning, 2012 to 2015, I keep trying to be as clear as I possibly can. Maybe the audio is bad, maybe I'm mumbling, but I'm asking you about a relevant tax period because that's the one the tax court is focused on, and that's why we're all here today, and I can't seem to get a straight answer. Is the $339,000 correct, or is it wrong? The $339,000 is correct. Great. So you paid $6 million in premiums for $339,000 in claims? Correct. And that's insurance? Yes, Your Honor. Even though there's liquidity problems with the $6 million worth of premiums, and even though one of those is a $13,000 claim for tail insurance? So when the claims were reimbursed, when the claims were paid, that amount was recognized in income. The issue of whether or not the premiums that were paid was too high, again, that's a valuation issue. I understand, I think to Judge Jones, a question, which is, if the premiums are too high, is there a capitalization issue? I think that the captains were adequately capitalized. That wasn't an issue. The consultant said it wasn't, or maybe we're using different words, but she said, well, I have some liquidity questions because you're paying $6 million in premiums. It's all getting invested. And she says, well, there's a liquidity problem, which would obviously be a problem for real insurance companies because real insurance companies are expecting claims. And that was addressed. I mean, Dr. Swift put his personal net worth at risk for the benefit of these independent contractor physicians and all these other unrelated insurers. He made a promise to the extent there was a liquidity issue, he would buy the assets that were held by the captains. But promising to pay claims on third-party medical providers outside of the statute of limitations, I mean, some of these promises are clearly illusory. You have to at least give me that. If your investments are illiquid and a claim comes up, you go to the bank, you get a lien on the investment, and you pay the claim. I agree with that. I think you would. I see I'm just about out of time, unless there are any other questions. All right. Thank you very much.